[Civil No. 3475. Filed June 17, 1935.]

[46 Pac. (2d) 1068.]

BUCKEYE IRRIGATION COMPANY, a Corporation, Appellant, v. SAMUEL C. ASKREN, Administrator of the Estate of CARL ASKREN, Deceased, Appellee.

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellant.

Mr. Dale McMasters and Mr. James E. Nelson, for Appellee.

ROSS, J.—This is an action by the personal representative of the estate of Carl Askren for damages on account of his death, alleged to have been caused by and through the negligence of the defendant, Buckeye Irrigation Company. Under an agreement of the parties, a jury was waived and the case was tried before the court, two Judges, Honorable M. T. PHELPS and Honorable J. C. NILES, sitting. The issues upon the trial were decided in favor of the defendant, and thereafter plaintiff made a motion for a new trial. From an order granting this motion, the defendant has appealed.

The grounds of the motion for a new trial were, in effect and substance, that the court's decision was not justified by the evidence and was contrary to law. If the evidence makes out a cause of action for damages as alleged in the complaint, the order granting a new trial must be sustained. The presumption is in favor of the correctness of the order granting the new trial. *Young Mines Co., Ltd.,* v. *Citizens' State Bank,* 37 Ariz. 521, 296 Pac. 247. We shall examine the evidence and determine therefrom if the order was in fact justified.

The evidence construed in its most favorable light, as it should be on an appeal from an order grant-

ing a motion for a new trial, reasonably supports the following facts: The defendant is a *quasi*-public corporation, organized under the laws of the state for the purpose of furnishing irrigation water to the Buckeye farming community. In 1919 it was engaged in enlarging, constructing, or extending its canal system, and after such development was completed, it had left over from twenty-two to twenty-five metal cans of black blasting powder, which it stored in what is referred to in the evidence as a "dugout," located about one-half mile from its diversion dam on the Gila River. This dugout or powder house was some three or four hundred feet from the highway and about the same distance from some buildings belonging to defendant, in front of which was a wire fence and also the public highway. Near the buildings there was a gate on which was painted a sign, "Private Property Keep Off." The buildings were occupied as a dwelling by an employee of defendant and his family consisting of children from one or two to twelve years of age. This employee was a caretaker of the buildings, also of the powder house, and, although there is no positive evidence to that effect, we think of the diversion dam and the grounds on which these improvements were located. The powder house was excavated into the wall of a ravine, roofed over with boards, brush, and earth. The entrance way to this powder house consisted of a frame door constructed so that it could be locked. When the powder was first placed therein (1919), the door was locked, but some time thereafter, probably in 1930 or before, the door was or became unlocked and thereafter stood ajar so that persons could enter the powder house, or could reach the powder in the cans without entering. In the meantime the dirt walls had caved in covering up the cans, which later eroded exposing the powder. This pow-

der house was located in an isolated spot, could not be seen from the public highway, and was surrounded by a growth of brush and weeds. There was no road or trail leading to or from it. It was on a point of land formed at the junction of the Gila and Agua Fria Rivers. A third side was inclosed by the fence in front of the house mentioned above.

On or about the 8th day of February, 1931, the decedent, who was then thirteen years of age, and his brother Leslie, who was about nine years of age, went to this powder house on defendant's premises and took therefrom two cans of black powder, whose bottoms had rusted away, carried them for something like a half mile onto the desert, and there took from the cans some of the powder and put it into their pockets. From this point they went farther onto the desert, where they stopped, and with the powder, as Leslie explained in his testimony, "made snakes on the ground." The decedent struck a match for the purpose of igniting the make-believe snake. When he did so, it flared up and ignited the powder in his pockets and as a result he was so badly burned that he died within some four hours.

The decedent and his brother Leslie had been to the powder house three times before. The defendant's caretaker, one Damron, who had children near the age of the Askren children, had several times invited them, as also some children of the Meador family who lived in the neighborhood, to the premises. On one of these occasions Damron stood near or against the powder house while he did some target shooting with a twenty-two rifle, and these boys were present. At that time the door to the powder house was open. It seems that the grounds around or near, that is, within 150 or 200 yards of the powder house, were on occasion used by the neighborhood families for picnic purposes under per-

mit from the defendant, and that on such occasions the picknickers were allowed to fish in the reservoir back of the dam and along the river.

Decedent's attention had been called to the powder by the Damron children and once before, according to Leslie Askren's testimony, he and his brother had taken powder from the powder house. At the times they took powder they reached the powder house by going along the river bed and up the ravine. On these trips they saw no one and were seen by no one. They took the powder to play with.

Decedent was a seventh grade pupil in the public schools. He did not like school, but was apt at machinery.

Whether the keeping of the powder by defendant on its premises, in a way or manner that permitted the children of the neighborhood access to it, with the knowledge that such children knew of its accessibility and were accustomed to visit the premises, was a violation of the duty it owed to such youth so as to make it liable in damages to one of them injured or killed thereby, is the question.

That the defendant exercised due precaution in the disposition of the left-over powder in 1919 is evident. It constructed an underground storage place for such powder and placed it therein under lock and key; it was located in an out-of-the-way place. If defendant's agents had not invited the neighboring families to come upon the grounds with their children to picnic, fish and play, probably the location of the powder would not have been discovered. Or, if the powder house had been kept in repair and locked, the powder could not have been obtained by trespassers or others. This powder was not something that was being used from day to day in the defendant's operations. Apparently defendant had not had occasion, from the time it was stored

in 1919, to use any of it. The care defendant took originally to store the powder indicates it desired to preserve its property for future use, as also to prevent children and others from taking or destroying or tampering with it, but its subsequent failure to keep it under lock or to protect the containers from coming in contact with the damp earth and rusting away so that their contents could be extracted with the hand indicates defendant had grown indifferent as to what became of the powder or those who might meddle with it. Such indifference falling under the observation of children might also induce a belief on their part that they were doing no great wrong in taking the powder to play with. There was no business reason for its being exposed to anyone. In other words, defendant cannot defend on the ground that it was necessary to its business that the powder be left easy of access, as it was not being used. Its situation was not, for instance, like that of the operator of a cotton gin, who cannot gin cotton unless the engine, pulleys and conveyers are functioning.

" . . . The rule is that one having explosives in his possession, so far as their safekeeping is concerned, is under a duty to exercise the highest care to avoid them coming into the hands of children and causing harm to or through them, and it is conceded in the majority of jurisdictions, and conceded in all jurisdictions that apply the doctrine of attractive nuisance, that whether the children are or are not trespassers is immaterial, if there is a reasonable probability of their presence that would create a danger of the explosives falling into their hands." *Lone Star Gas Co.* v. *Parsons*, 159 Okl. 52, 14 Pac. (2d) 369, 374.

It is clear defendant was guilty of negligence in permitting the powder house to become out of repair and unlocked, in view of the fact that its location

and condition were known to the children of the neighborhood.

■■ Notwithstanding such negligence and carelessness, a person of maturity and discretion going upon defendant's premises and appropriating the powder left unprotected and receiving an injury therefrom could not recover damages, because such person would be a trespasser and a lawbreaker. The general rule is that a property owner owes no duty to trespassers except not wilfully or intentionally to inflict an injury upon them. *Salladay* v. *Old Dominion etc. Min. Co.,* 12 Ariz. 124, 100 Pac. 441; *Salt River Valley Water Users' Assn.* v. *Compton,* 39 Ariz. 491, 8 Pac. (2d) 249. This very just rule applied to persons of maturity and discretion is not the rule as to trespassing children, who because of their youth do not appreciate the risks and perils of their actions or conduct. The attractive nuisance doctrine under which this exception is extended to children recognizes it as the duty of the members of society in certain circumstances to protect young children against themselves. It is well known that the normal child is full of curiosity, and that it is his nature to meddle with everything regardless of whose it is, or where it is, or what it is, and more especially if it is bright in color, will burn, make loud noises or is unusual in its qualities. He wants to investigate and try out things. The leaving of black powder exposed on one's premises is to children who know of its high inflammability almost or quite as alluring as would be a package of firecrackers. It takes no profound knowledge of the child mind to know what the child would do if a lot of firecrackers were left, even though in a place isolated and remote, where he could take them without hindrance or detection. He

would certainly appropriate the firecrackers "to play with" as decedent did the black powder.

In view of the fact that decedent and other children of the neighborhood had, upon the invitation of defendant's agents, been upon the defendant's premises, and had seen the powder and discovered its easy accessibility, and in view of the propensity of children to seek amusement in dangerous and novel ways, the action of the decedent and his younger brother in taking the powder and playing with it by strewing it upon the ground in snake fashion and firing it, might well have been anticipated by the defendant. In other words, the decedent's act in taking the powder and in setting it on fire was not so unusual or extraordinary as that it could not have been foreseen and prevented with slight caution and expense— caution in not exposing its location to the neighborhood children or, having done so, care safely to secure it against their appropriating it.

The policy of protecting the owner of land in its full use and possession should not be interfered with except when the general welfare and good require it. To the extent that others may invade his possession or restrict the use of his lands, its value to him is lessened. The general rule, therefore, of exempting him from liability for damages to trespassers upon his premises, except when the injury is intentionally or wilfully inflicted, as we conceive it, ought not to be abrogated. But, like most general rules, to make it of universal application would result at times in great hardships as well as injustice. Hence has grown up the attractive nuisance doctrine, which in its main features has been adopted by most of the states, although there has not been agreement as to its concurrent essentials. Because of the varying facts of each case, it is difficult, if not impossible, to state a

rule of general application, but we think for practical purposes the American Law Institute's Restatement of the Law of Torts, section 339, has reasonably done so. Such section reads as follows:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

"(a) The place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) The condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) The children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) The utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

 It seems to us that defendant's acts of commission and omission, under the facts and circumstances, bring it as a possessor of land within the rule stated. It had created and maintained an unnatural, artificial condition on its land, knowing that children might trespass thereon, also realizing and knowing that for them to handle, tamper or play with the powder by setting it on fire, as they were likely to do, would expose them to unreasonable risk of death or bodily harm. And defendant's business of a common carrier of water not requiring such dangerous, artificial condition, liability should follow, providing the decedent because of his youth did not know or discover or realize the risk involved in igniting the powder. If he did realize the dangerous qualities of the powder and the risk to which he exposed himself when he

touched it with a lighted match, then the reason for the attractive nuisance rule would not apply. The rule was not made for those persons, young or grown up, who know and realize the risks they are taking.

The two judges as the triers of the facts, in order to justify the vacation of the judgment against plaintiff and the order granting him a new trial, must have found that the decedent because of his youth did not realize the risk he was taking in lighting the powder on the ground with a match while standing near by with some of the powder in his pockets. The decedent knew the powder would burn; that is the reason he took it. He wanted to play with it by making snakes on the ground. He and his brother had taken powder once before and doubtless had used it to make pyrotechnic displays. If he had ever before seen black powder touched off with a match, he knew that it flashed or flared with lightning speed, consuming itself and burning inflammable substances of all kinds on coming in contact with them. In other words, he knew the powder was dangerous, if lighted, but did not anticipate or expect the blaze would penetrate his pockets and ignite the contents thereof. Whether he realized his danger we think depends upon his experience and intelligence. He was thirteen years of age and in the seventh grade; he did not like school, but had an aptitude for working with machinery.

In *Southwest Cotton Co. v. Clements,* 25 Ariz. 169, 215 Pac. 156, 157, in speaking of the age of the plaintiff who was injured by the explosion of a dynamite cap found by him on defendant's premises, we used this language:

"This court has held that negligence cannot be imputed to a child 4 years and 4 months old (*De Amado v. Friedman,* 11 Ariz. 56, 89 Pac. 588), but this arbitrary rule could not reasonably be extended to a child of 12 years of age. A child of the latter age may be,

by reason of his knowledge, association, experience, training, and education, quite as appreciative of the effects of any given action, conduct, or movement as a person of more mature mind and years. So as each case arises it must depend upon its own facts and circumstances. No hard and fast rule has been, or can be, laid down, based upon age alone. The criterion is intelligence, knowledge and experience. *Baker* v. *Seaboard Air Line Ry. Co.*, 150 N. C. 562, 64 S. E. 506, 17 Ann. Cas. 351, and note, 29 L. R. A. (N. S.) 846; *Schoonover* v. *Baltimore & O. R. Co.*, 69 W. Va. 560, 73 S. E. 266, Ann. Cas. 1913B 964, L. R. A. 1917F 1. In the last case it is said:

" 'The standard or measure of duty in each case is determinable by the capacity ordinarily possessed and exercised by children of the age and development of the class to which the individual belongs.' "

██ While the evidence and circumstances indicate the decedent did realize and appreciate the danger to which he was exposing himself, we cannot say that persons of equal intelligence and honesty may not reasonably draw a contrary conclusion, as the court in this case did.

██ Defendant argues that it was not its act, in allowing the place of storage of the powder to become unlocked and out of repair, and in allowing and inviting the neighborhood children upon the premises, that proximately caused the injury and death of decedent, but decedent's act in appropriating the powder, taking it upon the desert, and applying a lighted match to it. It, of course, is necessary that the injury and death for which damages are claimed should have been caused by the negligence of the defendant; that is, defendant's negligence must have been the efficient, proximate cause of the injury and death. In actions for damages by children caused by explosives, the courts have not been in accord, even where the material facts are the same, as to the proximate cause

of the injury. In nearly all of these cases the general outline is the same, that is, the child, or someone from whom he receives it, has found the explosive upon defendant's premises and has presently or some time thereafter in playing or experimenting with the explosive been injured. Some of the courts, and we think the minority, take the view that the proximate cause of the injury in such situation is the child's wrongful act in appropriating and exploding the dynamite or igniting the powder; and others, and we think the majority, that it is the act of the defendant in negligently keeping the explosive upon his premises where children are accustomed to go.

*Stephens* v. *Blackwood Lumber Co.*, 191 N. C. 23, 131 S. E. 314, 43 A. L. R. 426, strikingly resembles in its facts the case we are considering. There a boy fourteen years of age, with the mentality of a boy of from eight to ten years of age, went to defendant's plant, entered a building, took some black powder easily accessible, put it in his pocket, and the same evening, on his way from church, some three or four miles from defendant's plant, put the powder in an envelope and lighted it with a match while holding it in his hand, whereupon it exploded and he was burned to death. While holding the defendant negligent in the storage of the powder, it was said that such negligence was not the proximate cause of the boy's injury and death, but, rather, that it was his own act. The cases sustaining this rule, as also the contrary rule, are collated in the annotation to the Stephens' case in 43 A. L. R., at page 442, and without setting them out we make reference thereto only.

It is quite obvious that decedent would not have been injured had the defendant not been negligent in the keeping of the powder. It is equally clear that he would not have been injured had he not ignited the powder.

In *Mesa City* v. *Lesueur,* 21 Ariz. 532, 190 Pac. 573, 575, we laid down this rule:

"It is a principle of law, well established by the authorities, that where several proximate causes contribute to an accident, and each is an efficient cause without the operation of which the accident would not have happened, it may be attributed to all or any of the causes but it cannot be attributed to a cause unless without its operation the accident would not have happened. These rules have full support in the text books, as well as in our cases. 29 Cyc. 497; 1 Shearman & Redfield on Negligence, par. 10, note 2, and cases cited; 16 Am. & Eng. Enc. of Law 440–442; *Crandall* v. *Consolidated Tel. etc. Co.,* 14 Ariz. 322, 127 Pac. 994; *Phoenix Ry. Co.* v. *Beals,* 20 Ariz. 386, 181 Pac. 379."

We would add to this statement that where the child realizes and appreciates the probable effect of his act, the chain of causation started by the negligence of the defendant would be thereby broken and the child's act would become the proximate cause of his injury or death. At all events, the question as to the proximate cause of the death of plaintiff's decedent is one that has to be passed upon by a jury or by the court sitting as a jury. *Miller* v. *Gooding Highway Dist.,* 55 Idaho 258, 41 Pac. (2d) 625.

We should state that what we have said in this opinion will be binding in a new trial only to the extent that the facts are the same. In all we have said, we have been trying to show that the new trial, under the facts as they appeared, was properly granted.

The order granting the motion for a new trial is affirmed.

McALISTER, J., concurs.

LOCKWOOD, C. J., Specially Concurring.—I concur in the conclusion reached by the majority of the

court that the order granting a new trial should be affirmed, but I do not agree that the principle of attractive nuisance applies to the facts of the case. I think there is evidence which would justify the triers of fact in finding that plaintiff's decedent was not a trespasser, but rather upon the premises through the implied invitation of defendant's agent.