512 P.2d 30

Dan W. CLARKE and Eileen J. Clarke, husband and wife; and the American Smelting and Refining Company, a New Jersey corporation, Appellants,

v.

J. N. EDGING, as the natural surviving father of Deborah Carol Edging, on behalf of J. N. Edging and Dorothy Edging, natural parents of Deceased, Appellees.

No. 2 CA–CIV 1324.

Court of Appeals of Arizona, Division 2.

July 17, 1973.

Rehearing Denied Aug. 21, 1973.

Chandler, Tullar, Udall & Richmond, Tucson, by D. B. Udall, for appellants.

W. Mercer Bouldin, Tucson, for appellees.

HOWARD, Judge.

The appellees commenced an action for the wrongful death of their twelve year-old daughter, Deborah Carol Edging, against both appellants on the theory of the maintenance of an "attractive nuisance" and as to appellant The American Smelting and Refining Company on the theory of absolute liability because of blasting at its mine. At the conclusion of the trial the absolute liability issue was dismissed.

The questions submitted to the jury were in essence the following. (1) Were appellants or either of them liable on the theory of attractive nuisance? (2) Was the deceased child or her parents contributorily negligent? (3) If appellants or either of them were liable to plaintiffs, in what amount?

The question of contributory negligence was resolved in favor of plaintiffs-appellees and this determination has not been questioned on appeal.

The final verdict of the jury was in favor of the deceased child's parents in the amount of $65,000 and against both appellants. All post-trial motions of appellants were denied by the lower court.

The salient facts, viewed in a light favorable to upholding the judgment, are as follows. The American Smelting and Refining Company (hereinafter referred to as A. S. & R.) purchased land near Sahuarita, Arizona and leased certain farmland to appellants Clarke effective January 1, 1970. Prior to purchase by A. S. & R. Clarke had leased the land from the former owner for approximately one year, had toured and inspected the property, and during the term of the lease had exclusive control of the property. Operating under the name Mission Valley Farms, Clarke planted a maize crop around July 1, 1970, and irrigated the crop.

At the west end of the farmland is a deep man-made drainage channel which eventually feeds into the Santa Cruz River. It is approximately four to five feet wide and fifteen feet deep. This drainage way follows a natural drainage system and had been deepened and improved in order to carry drainage water from lands to the east, to protect the farmlands to the west of the ditch and to protect the old Tucson-Nogales Highway. At two points on the west end of the farmland irrigation overflow had made deep gullies leading to the channel creating three-sided gullies or cul-de-sacs at these places.

The property had been fenced at one time with barbed wire, but most portions of the fence were down. There were no signs on the boundaries to indicate "No Trespassing".

The deceased child lived with her parents and siblings in a mobile home subdivision adjacent to the maize field and a short distance from the accident scene. The subdivision had been in existence for about five years and twenty to thirty children lived there. The Edging family had lived in this area approximately six months before the incident occurred.

The children from the subdivision played in the drainage ditch on numerous occasions. On November 11, 1970, a school holiday, the deceased child was one of four children who had been playing in the gully and channel on two separate occasions on that date. Deborah Edging was killed while she was "playing house" in an eroded gully on the edge of Mr. Clarke's maize field when a portion of the land fell and a large clod of dirt struck her head. She died almost immediately. At the time of her death Deborah was twelve years old, was in very good health and a reasonably good student.

QUESTION I: Does the "attractive nuisance" doctrine apply to the condition which caused Deborah Edging's death; *i. e.,* was the eroded gully in which she was playing when killed a *natural* or an *artificial* condition?

The general rule is that the owner or occupier of property owes no duty to trespassers except to neither wilfully nor intentionally inflict injury upon them. The rule precluding liability of a property owner or possessor for injuries sustained by an adult trespasser is subject to an exception in the case of trespassing children who because of their youth do not appreciate a situation involving a risk or danger. Buckeye Irrigation Company v. Askren, 45 Ariz. 566, 46 P.2d 1068 (1935).

This exception is embodied in § 339 of the Restatement (Second) of Torts which Arizona has adopted and cited favorably in State v. Juengel, 15 Ariz.App. 495, 489 P. 2d 869 (1971); Spur Feeding Company v. Fernandez, 106 Ariz. 143, 472 P.2d 12 (1970) and Giacona v. Tapley, 5 Ariz.App. 494, 428 P.2d 439 (1967), which Section reads:

"§ 339. Artificial Conditions Highly Dangerous to Trespassing Children

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

While the Restatement limits its rule to artificial conditions, the Caveat and the Comment on the Caveat to this Section state:

"The Institution expresses no opinion as to whether the rule stated in this Section may not apply to natural conditions of the land."

\* \* \* \* \* \*

"Comment on Caveat:

*p.* The Caveat leaves open the question whether the rule stated in this Section may not apply to natural conditions of the land. The case law thus far indicates that it does not so apply; but in all of the decided cases the condition has been one, such as a body of water, which the child might be expected to understand and appreciate, as stated in Comment *j.* In most instances the burden of improving land in a state of nature in order to make it safe for trespassing children would be disproportionately heavy (see Clause (d)), and for that reason alone there would be no liability. Cases may, however, arise in which there would be no such disproportionate burden, and the natural condition is one which the child could be expected not to understand. The Caveat leaves open the possibility of liability in such a case."

In addition, Comment b to § 363, Restatement (Second) of Torts entitled "Natural Conditions" defines the meaning of "natural condition of land" as follows:

". . . 'Natural condition of the land' is used to indicate that the condition of land has not been changed by any act of a human being, whether the possessor or any of his predecessors in possession, or a third person dealing with the land either with or without the consent of the then possessor. It is also used to include the natural growth of trees, weeds, and other vegetation upon land not artificially made receptive to them. On the other hand, a structure erected upon land is a non-natural or artificial condition, as are trees or plants planted or preserved, and changes in the surface by excavation or filling, irrespective of whether they are harmful in themselves or become so only because of the subsequent operation of natural forces."

■ When a condition on land is created by the action of man, the condition is artificial and not natural. In State v. Juengel, 15 Ariz.App. 495, 489 P.2d 869 (1971), the action creating the condition was the application of explosive force. In the case at bench, the action was the application of water. As in *Juengel,* the condition created here was artificial and not natural.

In Norton v. Black, 12 Ariz.App. 209, 469 P.2d 101 (1970), this court relied upon a statement expressed in Salt River Valley Water Users' Association v. Compton, 39 Ariz. 491, 8 P.2d 249 (1932) to the effect that "various natural objects, . . . no matter how attractive they may be for children in themselves, do not come within the doctrine of attractive nuisances. . . ." The broad language in *Norton,* supra, which appellants cite as a basis for their appeal states:

"We believe, however, that the Arizona Supreme Court has taken a stand as to this caveat and has held that the 'attractive nuisance' doctrine only applies to objects of unusual character, more than ordinarily attractive, and never applies when the objects are natural and not placed on the property by the landowner."

While the foregoing statement is followed as a general rule, we believe that it is not applicable to the unique set of facts disclosed in the case *sub judice.* At trial appellees' expert witness, a professor of civil engineering and a Ph.D. in mechanics and hydraulics, including hydrology, which is the science of rainfall, the run-off from rainfall, and sediment transportation, expressed his opinion and conclusion that the gully in which Deborah Edging was killed

was possibly created by some rainfall drainage, "but it was more likely and more severely the irrigation" and run-off from the irrigation of the maize field which created the hidden and dangerous condition in the gully. In other words, while the gully from Mr. Clarke's maize field appeared to be a part of the general landscape, the eroded gully, of which Mr. Clarke had knowledge, was directly and affirmatively contributed to by his irrigation practices, and which could have been, according to this expert witness, readily and economically remedied. The witness based these conclusions upon observations of the land, examination of maps, and upon the presence of maize in the gully which had been carried there by irrigation run-off from the maize field.

■ We therefore hold, on this issue, that the eroded gully on Mr. Clarke's leased property as described by the various witnesses could be determined by the jury under proper instructions from the court to be an artificial condition under the theory of attractive nuisance. This question of fact, resolved in favor of the appellees, was within the prerogative of the jury and we will not disturb its conclusion. *See*, Ridgewood Groves, Inc. v. Dowell, 189 So. 2d 188 (Fla.App.1966).

For the position that the origin of the dangerous condition should not in itself make all the difference, if the possessor could easily remove it or protect against it and fails to do so, *see*, W. Prosser, The Law of Torts § 59 at p. 367 (4th Ed. 1971); Harper and James, II. The Law of Torts § 27.5 at p. 1453 (1956); and Justice Traynor's pointed dissenting opinion in Knight v. Kaiser Company, 48 Cal.2d 778, 312 P.2d 1089 (1957).

Since the water from the field was being used for irrigation and since it drained to the channel, appellants contend that the irrigation canal cases represented by Dombrowski v. Maricopa Co. Mun. Wat. Cons. Dist., 108 Ariz. 275, 496 P.2d 136 (1972), and all of its ancestors apply. In this state the doctrine of attractive nuisance does not

extend to irrigation canals and diversion points or to the various mechanical and electrical equipment needed to operate the water distribution system. The basis of such immunity is two-fold: (1) Public policy, since the very lifeblood of our economic stability rests upon the irrigation of our arid lands and (2) the feeling that the dangers are "not only obvious, but where the object itself from which the danger arises is of such a character that, . . . 'the defendant was entitled to assume that the plaintiff's natural guardian would protect him.'" Salladay v. Old Dominion Etc. Min. Co., 12 Ariz. 124, 100 P. 441 (1909); Lee v. Salt River Valley Water Users' Ass'n, 73 Ariz. 122, 238 P.2d 945 (1951).

We do not agree with this contention. While irrigation canals are the lifeblood of the economy of this state, deep gullies and erosion created by the overflow of irrigation waters are not necessary to the lifeblood of the State of Arizona.

In addition to there being sufficient evidence for the jury to determine that the gully was an artificial condition, there was also sufficient evidence presented at trial to meet the five elements of the attractive nuisance doctrine.

"(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, . . ."

The jury could find from the evidence that Mr. Clarke knew or had reason to know that neighboring children would trespass on his property. He testified that he was aware of the subdivision and realized that children are attracted to play areas to which they have easy access and where they can use their imagination. He also stated:

"You asked about my instructions. I told some of them. I saw one boy on the property one time, way over in the middle of the farm, nothing to do with this place, and he was over there picking peanuts, and I told him to stay off, and he said he would."

*See,* Spur Feeding Company v. Fernandez, supra.

"(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, . . ."

Mr. Clarke testified that he had inspected his property and knew of the eroded areas. He stated that not only did the eroded condition present a danger to children, but ". . . it is a hazard to anybody . . . ." The jury could conclude that the formation in question created an unreasonable risk of death or bodily injury from its instability. *See,* State v. Juengel, supra.

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, . . ."

When asked the question, "Do you feel to your knowledge whether or not a twelve year old little girl would have appreciated the danger of those banks caving in . . . .", Mr. Clarke replied, "No . . . I would say that she couldn't appreciate it . . . ."

"(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, . . ."

Testimony was presented by appellees' expert witness that the eroded gully could easily have been remedied by leveling the eroded portions of the dike on the subject property. There was no utility to the possessor in maintaining the eroded areas, and these may even have demonstrated improper farming practices. In addition, the cost of maintaining fences and signs on the boundaries of the leased property was slight as compared with the risk to the children who played there. *See,* Spur Feeding Company v. Fernandez, supra; Downs v. Sulphur Springs Valley Electric Cooperative, Inc., 80 Ariz. 286, 297 P.2d 339 (1956).

"(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

There is no evidence that the possessor attempted any of the foregoing suggested safeguards. It was only after Deborah Edging's death that fences were put up and signs posted by A. S. & R.

■ We therefore conclude that the trial court did not err in giving an instruction on the attractive nuisance doctrine. The record discloses that there was sufficient evidence for the matter to go to the jury for determination.

QUESTION II: Is the owner of land which is leased liable to a trespassing child under the attractive nuisance doctrine?

■ The attractive nuisance doctrine as set forth in § 339 of the Restatement (Second) of Torts appears to be limited to a "possessor of land." In the same Chapter of the Restatement, a "possessor" of land is defined:

"§ 328E. Possessor of Land Defined

A possessor of land is

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, . . ."

According to Prosser, supra, § 63 at p. 399, when land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the premises for the term. The lessee acquires an estate in the land and becomes for the time being the owner and occupier.

■ In addition, the general rule is that there is no liability upon a landlord, either to the tenant or to others entering the land, for defective conditions existing at the time of the lease, unless the lessor knew of such conditions and failed to in-

form the lessee of such. *See* §§ 356, 358, Restatement (Second) Torts.

 In the instant case, Mr. Clarke had been in possession of certain leased farmland for over a full year prior to A. S. & R.'s purchase in March, 1970. A. S. & R. bought the land and continued to lease certain farmland to Clarke, but had no control over the farming operation or the land itself.

Since the Restatement limits itself to "a possessor of land", we believe it was error to allow the case to be submitted to the jury for purposes of A. S. & R.'s liability.[1] As to appellants Clarke, the judgment is affirmed and as to American Smelting and Refining, the judgment is reversed with directions to enter judgment in its favor.

HATHAWAY, C. J., and KRUCKER, J., concur.

---

1. At oral argument before this court, appellees conceded that the court erred in this issue.