680 P.2d 155

Loretta M. MAST, individually and as surviving spouse of Marvin Eugene Mast, on behalf of herself as surviving spouse of Marvin Eugene Mast; and on behalf of Robert Kevin Mast and Patricia Ann Mast, the surviving children of Marvin Eugene Mast, Plaintiffs-Appellants,

v.

STANDARD OIL COMPANY OF CALIFORNIA, a Delaware corporation, Defendant-Appellee.

Donald A. FORMENTINI and Lola L. Formentini, husband and wife, Plaintiffs-Appellants,

v.

STANDARD OIL COMPANY OF CALIFORNIA, a Delaware corporation; and Atchison, Topeka and Santa Fe Railway Company, a Delaware corporation, Defendants-Appellees.

No. 1 CA–CIV 5517.

Court of Appeals of Arizona, Division 1, Department A.

March 8, 1983.

Rehearing Denied April 28, 1983.

Review Granted Sept. 20, 1983.

Hughes & Hughes, P.C. by John C. Hughes, Phoenix, for plaintiffs-appellants Mast.

Law Offices of Paul G. Rees, Jr., P.C. by Paul G. Rees, Jr., Tucson, for plaintiffs-appellants Formentini.

Ryley, Carlock & Ralston by Charles L. Chester, Phoenix, and Lawler, Felix & Hall by Thomas E. Workman, Jr., F. John Nyhan, Anthony R. Delling, Los Angeles, Cal., for defendant-appellee Standard Oil Co. of California.

Fennemore, Craig, von Ammon, Udall & Powers, P.C. by Linwood C. Perkins, Jr., John G. Ryan, Phoenix, for defendant-appellee Atchison, Topeka and Santa Fe R. Co.

## OPINION

OGG, Presiding Judge.

This appeal arises from a tragic fire and explosion of a tank car in Kingman, Arizona. The initial fire severely burned two workmen unloading the car (decedent Marvin Mast and Donald Formentini) and led to the subsequent explosion of the tank car which killed and injured more than 100 people.

Plaintiff-appellant Loretta Mast, widow of Marvin Mast, appeals from a summary judgment granted in favor of defendant-appellee Standard Oil Company of California (Standard Oil) [1]. Plaintiff-appellants Donald and Lola Formentini, husband and wife, appeal the summary judgment in favor of Standard Oil and the Atchison, Topeka and Santa Fe Railway Company (Santa Fe). Mrs. Mast and the Formentinis also appeal from the trial court's order denying a new trial.

The primary issue raised by appellants in their appeal of Standard Oil's summary judgment is whether there was sufficient negative evidence to show that lack of odorization of the liquefied petroleum gas (LPG) in the tank car was a proximate cause of the fire and injuries sustained by Mast and Formentini. In their appeal of Santa Fe's summary judgment, the Formentinis raise the issue of whether Santa

---

[1]. The Mast children were parties in this action in the trial court. They waived their right to appeal pursuant to stipulation and order, and are not parties in this appeal.

Fe is liable in its status as common carrier and lessor for transporting a load of LPG to allegedly defective unloading facilities maintained on premises leased by Santa Fe. A second issue raised by the Formentinis is whether Santa Fe is strictly liable for engaging in an ultrahazardous activity.

Briefly stated, the factual and procedural history of this extended litigation is as follows. At the time of the accident, Marvin Mast and Donald Formentini were employees of Williams Energy Company (Williams) in Kingman.[2] Mast was plant manager with extensive experience in handling tank cars loaded with LPG. Formentini was employed by Williams three months prior to the accident as a maintenance worker and as a delivery driver of propane gas. He had minimal experience with liquefied gases and had never been on top of a tank car before the accident.

On the day of the accident, July 5, 1973, Mast and Formentini climbed on top of the tank car to prepare the transfer of LPG from the car, located on Williams' industry track, to the plant storage tanks. The transfer of the LPG was to be made through the plant unloading riser, which consisted of two lines for liquid LPG and one for vaporized LPG. These lines were comprised of piping, swivel joints, flexible rubber hoses, wire clamps and couplings connected to the tank car transfer valves by adapter pipes. The transfer valves were located in the dome of the tank car. A compressor at the plant site pumped vaporized LPG from nearby storage tanks into the car, which forced LPG out of the liquid transfer valves into the riser and through an underground pipeline to the storage tanks.

While on top of the tank car, Mast and Formentini performed preliminary steps in the transfer process. After measuring the temperature and liquid level of the LPG, they screwed the three adapter pipes into the tank car transfer valves and connected the pipes to the three lines on the unloading riser. Mast then partially opened, and

approximately twenty minutes later, fully opened the tank car vapor transfer valve, filling the vapor line with vaporized LPG. Each of the liquid transfer valves was then slightly opened, which allowed the LPG to enter the liquid unloading lines.

At that point, Mast stated that he heard something leaking. In an effort to stop the leak, Mast struck several short blows against the riser hose vapor line coupling with the back of an aluminum wrench. Mast, however, still heard something leaking. Formentini tested the air for odor but did not smell any LPG leaking. When Mast struck a coupling on one of the liquid lines, the leaking LPG gas ignited, severely burning Mast and Formentini. Mast died that day from injuries sustained in the fire. Formentini survived but is permanently and severely disfigured.

After Mast and Formentini were removed from the area, the fire emanating from the unloading apparatus was directed onto the tank car, causing the shell to rupture. The LPG inside immediately vaporized and ignited, creating a large fireball which killed eleven firemen and injured many persons nearby.

All of the personal injury lawsuits stemming from the subsequent explosion of the tank car were dismissed with prejudice by settlement and are not at issue in this appeal. In June of 1979, the trial court granted all defendants' motions for summary judgment against the plaintiffs Loretta Mast and the Formentinis. This appeal of the judgments in favor of Standard Oil and Santa Fe and from the order denying a motion for new trial followed.

In reviewing the summary judgments granted by the trial court in this matter, we first note that a motion for summary judgment may be granted only when the evidence, viewed in a light most favorable to the party opposing the motion, shows that there are no material questions of fact and that the moving party is entitled to judgment as a matter of law. *Fer-*

---

**2.** Williams has not been a party to this litigation. As employees of Williams, Mast and For-

mentini were covered by Arizona workmen's compensation laws.

*ree v. City of Yuma,* 124 Ariz. 225, 603 P.2d 117 (App.1979). Extreme care should be exercised in granting summary judgment, *Northern Contracting Co. v. Allis-Chalmers Corp.,* 117 Ariz. 374, 573 P.2d 65 (1977). This is especially true in cases which involve negligence issues because such issues are not generally appropriate for summary adjudication. *Taylor v. Mueller,* 24 Ariz.App. 403, 539 P.2d 517 (1975).

Following these general precepts, we now review the summary judgments in favor of Standard Oil and Santa Fe.

## I. THE STANDARD OIL SUMMARY JUDGMENT

The appellants allege that if the tank car was filled without odorant, Standard Oil was liable under theories of strict product liability or common law negligence. Odorant is added to LPG to warn of its presence at certain concentrations. The common industry odorant is mercaptan (often referred to as "skunk oil"), which has a pervasive odor similar to skunk odor.

The only direct evidence pertaining to whether the LPG was odorized are the documents prepared by Standard Oil employees when the LPG was loaded into the tank car at Standard Oil's refinery. These documents indicate that Standard Oil personnel odorized the LPG before it left the refinery.

The appellants argue, however, that there was sufficient negative evidence that the LPG was not odorized to present a jury question, and rely on *Shell Oil Co. v. Collar,* 99 Ariz. 154, 407 P.2d 380 (1965), and *Byars v. Arizona Public Service Co.,* 24 Ariz.App. 420, 539 P.2d 534 (1975).

> [N]egative evidence can rise to the level of probative value only when coupled with a sufficient predicate, consisting of additional testimony or circumstances to show that the witness' position and attitude of attention were such that he prob-

ably would have heard or seen the occurrence of the event had it happened. *Id.* at 424, 539 P.2d at 538.

In his deposition testimony and affidavit, Formentini stated that after he became aware of the leak, he "slouched" down onto his knees and tested the air but failed to detect any odorant. Two of the appellants' experts concluded in their affidavits that had the LPG been properly odorized, a man such as Formentini who was standing very close to the alleged site of the buildup, was familiar with the smell of mercaptan and was testing for it, would have detected the odor. It is this evidence which the appellants assert established a proper predicate for the negative evidence rule.

■ We need not determine, however, whether this evidence supports application of the negative evidence rule in this case. A review of all the evidence before the trial court indicates no evidence that the lack of odorant proximately caused the injuries to Mast and Formentini. Proof that Standard Oil's conduct proximately caused the harm is an essential element under both negligence and strict liability theories. *See Kennecott Copper Corp. v. McDowell,* 100 Ariz. 276, 413 P.2d 749 (1966).

■ Standard Oil attached two expert affidavits to their motion for summary judgment which stated that the LPG in the tank car contained a concentration of propylene in excess of 11% and that propylene has a distinctive, pungent and disagreeable "gassy" odor.[3] These facts were not controverted and are presumed true. *W.J. Kroeger Co. v. Travelers Indemnity Co.,* 112 Ariz. 285, 541 P.2d 385 (1975).

The expert affidavits further state that a concentration of 11% propylene in the LPG is sufficient to meet the applicable federal regulation for odorization. In their brief, the Formentinis argue that there is no evidence the propylene meets federal regulation and further argue that mercaptan is the odorant required by law.

---

**3.** LPG from natural gas is odorless. Refinery-manufactured LPG always contains some propy-lene and therefore has a distinct odor, regardless of odorant.

The applicable regulation, 49 C.F.R. § 173.315(b)(1) (1973), provides:

(1) *Odorization.* All liquefied petroleum gas shall be effectively odorized as required in Note 2 of this paragraph to indicate positively, by a distinctive odor, the presence of gas down to a concentration in air of not over one-fifth the lower limit of combustibility: *Provided, however,* That odorization is not required if harmful in the use or further processing of the liquefied petroleum gas, or if odorization will serve no useful purpose as a warning agent in such use or further processing.

\*      \*      \*      \*      \*      \*

Note 2: The use of 1.0 pound of ethyl mercaptan, 1.0 pound of thiophane, or 1.4 pounds of amyl mercaptan per 10,000 gallons of liquefied petroleum gas shall be considered sufficient to meet the requirements of § 173.315(b)(1). This note does not exclude the use of any other odorant in sufficient quantity to meet the requirements of § 173.315(b)(1).

This regulation clearly states that an odorant other than mercaptan may be used, provided such odorant, "indicate[s] positively, by a distinctive odor, the presence of gas down to a concentration in air of not over one-fifth the lower limit of combustibility." The lower limit of combustibility is the lowest concentration of gas in the air that will burn.

As noted above, Standard Oil's experts' affidavits state that the propylene present in the LPG had a distinctive odor at a concentration at or greater than one-fifth of the lower flammable limit. The Formentinis assert in their brief that the propylene in the LPG did not meet the federal regulations. After Standard Oil filed a properly supported motion for summary judgment, however, the appellants were required to present, *either by affidavit or by some other evidence,* facts controverting Standard Oil's affidavit. Having failed to do so, we will consider as true Standard Oil's allegation that the propylene concentration alone satisfied the federal regulation.

*Sato v. Denburgh,* 123 Ariz. 225, 599 P.2d 181 (1979).

In light of the evidence that the LPG was sufficiently odorized, the appellants' claim that lack of odorization proximately caused the injuries to Mast and Formentini is no longer viable. Although the appellants' experts' affidavits conclude that the LPG must not have been odorized if Formentini failed to detect the odor, we find these affidavits inadequate to show a justiciable issue of fact as to negligence or strict tort liability. *See Byars v. Arizona Public Service Co., supra.*

It is clear from the deposition testimony and affidavit of one of appellants' experts, Wilbur Swett, that he assumed that the LPG was in its natural state and was odorless without an added odorant such as mercaptan. In his affidavit, for example, he stated that "in the absence of a mercaptan *or other odorant* in the leaking LP gas, ... there would be no warning of the building up or leaking LP gas." (Emphasis added.) There is also no evidence that the appellants' other expert was provided with information as to the source of the LPG prior to making his affidavit. We find that, without this information, their "opinions on causal connection as to odorization or lack thereof ... had to be based upon sheer conjecture. Such conclusions could only be characterized as possibilities." *Byars v. Arizona Public Service Co.,* 24 Ariz.App. at 425, 539 P.2d at 539. We find the trial court properly granted Standard Oil's motion for summary judgment on this issue.

The Formentinis have also raised the issue of whether Standard Oil was liable for engaging in an ultrahazardous activity. This argument against Standard Oil, however, appears to be abandoned in their reply brief and will not be considered further.

The appellant Mast raises two additional issues on appeal. Mrs. Mast first claims that there are material uncertain facts precluding a grant of summary judgment but points to no allegedly uncertain facts in the record other than with regard to the lack of odorization—an issue which we have al-

ready decided adversely to the appellants. We find no merit in this argument.

The second issue which Mrs. Mast raises is whether the trial court incorrectly granted summary judgment, when in Arizona issues of contributory negligence are left to the jury. Ariz. Const. art. 18, § 5. As Standard Oil correctly points out, their summary judgment motion was not based upon a contributory negligence defense, but rather upon the appellants' failure to show any causal connection between an alleged absence of odorant and the injuries sustained by Mast and Formentini.

We find no merit in this argument. The summary judgment in favor of Standard Oil is affirmed.

## II. THE SANTA FE SUMMARY JUDGMENT

At the trial court level and on appeal, Santa Fe contended that the most plausible explanation for the initial leak of LPG was failure of Williams' unloading equipment and not a defect in the tank car. The Formentinis assert that Santa Fe, nevertheless, owed a duty to Donald Formentini because of its status as common carrier bringing LPG to the allegedly defective unloading facilities and as lessor of the premises upon which the unloading riser was constructed. A second[4] theory of liability which the Formentinis raise is whether Santa Fe is strictly liable for engaging in an abnormally dangerous ultrahazardous activity. We now proceed to address these issues.

As authority for their contention that Santa Fe has a duty to oversee the safety of Williams' unloading facilities in its status as a common carrier, the Formentinis cite *Southern Pacific Co. v. Bolen*, 76 Ariz. 317, 264 P.2d 401 (1953). We find *Bolen* to be inapposite. In *Bolen*, the railroad operated a spur track under an indus-

trial track agreement for the benefit cf a ranch company. The railroad permitted or acquiesced in the movement of railroad cars by ranch company employees over a long time period. In the course of moving the cars on one occasion, the ranch company employees injured the appellee, Bolen. The court held that the obligations imposed by the railroad's franchise included movement of cars on a spur track and that the railroad could not delegate its duties to safely move cars to a licensee or lessee.

■ In this matter, Formentini does not allege his injuries arose from the breach of Santa Fe's obligation to safely move railroad cars. Rather, he alleges that there is a duty as a common carrier to prohibit the transportation of railroad cars to allegedly defective unloading facilities. *Bolen* provides no support for such a theory. We find no liability in Santa Fe's status as common carrier.

The Formentinis also argue that Santa Fe is liable in its status as lessor of the premises upon which Williams constructed the allegedly defective riser. They allege that "Santa Fe is a landlord with certain reserved powers over what is to be carried on upon the premises." According to the Formentinis, these reserved powers of control over the premises are to be found in three documents entitled "Contract for Industry Track", "Pipe Line License", and "Lease of Land", to which Santa Fe and Suburban Gas of Kingman (Williams' predecessor in interest) were parties. We now turn to an examination of these documents.

The Contract for Industry Track provided that Santa Fe would construct, operate and maintain a spur track to be used by Suburban Gas in the operation of its plant facilities. The Formentinis point to two provisions of the contract, in particular, as indicating that Santa Fe had a right to maintain or "be critical of" the unloading

---

**4.** In their opening brief, the Formentinis also raised the issue of whether Santa Fe was liable for lack of odorization of the LPG. The Formentinis conceded in their reply brief, however, that "when the shipper (Standard Oil) created a Bill of Lading certifying that the LPG had been

odorized, the railroad has no duty to go behind that certificate and conduct an independent test." In view of this concession and our disposition of this issue in the appeal against Standard Oil, we will not discuss the appellees' lack of odorization theory further.

facilities. Article I, paragraph 3 of the contract states that Williams will pay Santa Fe's expenses for maintaining the track and "any expense to which the Railway Company may be put in the way of paving, sewers, crossing protection or other work, because of the existence of The Track." Paragraph 7 of Article III provides that "This agreement shall be subject to all laws or orders affecting performance of the work provided for hereby or the use or procurement of materials therefor."

We find no evidence in the Industry Track contract, however, that the maintenance work on the unloading riser constituted "other work, because of the existence of The Track". Repair to the riser would not affect, in any sense, the maintenance and operation of the spur track, which is the sole focus of the contract. The Contract for Industry Track provides no support for the Formentinis' contention that Santa Fe had the right to exercise control over Williams' unloading facilities.

The gist of the Formentinis' argument with respect to the Pipe Line License is that the specifications, by drawing attached to the Pipe Line License, show the location of an unloading device. They reason, therefore, that Santa Fe's right of supervision and control over the pipeline specified in the license also extended to the unloading device. We note that the pipeline is defined in the license agreement as "one steel (1) pipe line, two and one-half (2½″ ) in diameter (hereinafter, ... called the 'Pipe Line')." We fail to see how Santa Fe's right of supervision over the construction and maintenance of the pipeline specified in the license agreement extended to supervision over the unloading riser.

The final document upon which the Formentinis rely is the Lease of Land in which Santa Fe leased 1.18 acres to Suburban Gas. Two key provisions relating to improvements placed upon the premises are paragraphs 7 and 8 of the lease. Paragraphs 7 and 8 provide in pertinent part:

7. Lessee shall keep and maintain the Premises and Improvements in such safe, sanitary, and sightly condition as shall be satisfactory to Lessor, and, if required by Lessor, shall paint the Improvements with paints of a color approved by Lessor; and if Lessee fails or refuses within fifteen (15) days after receipt of any request by Lessor so to do, Lessor may, at its option, perform such work, and in such event Lessee shall within thirty (30) days after the rendition of bill therefor reimburse Lessor for the cost so incurred.

8. In using the Premises, and in constructing, maintaining, operating and using the Improvements thereon, Lessee shall comply with any and all requirements imposed by federal or state statutes, or by ordinances, orders, or regulations of any governmental body having jurisdiction thereover.

According to the Formentinis, these two provisions gave Santa Fe, as lessor, the power to force compliance with federal and state safety requirements and to perform repair work, *at its option,* to bring the riser into conformity with law and regulations.

At common law, the tenant, and not the landlord, ordinarily was liable to third persons on the premises for injuries resulting from the condition or use of the demised premises. *Rendall v. Pioneer Hotel,* 71 Ariz. 10, 222 P.2d 986 (1950). This is because the law of property regards the lease as a sale of the premises for the lease term. *Clarke v. Edging,* 20 Ariz.App. 267, 512 P.2d 30 (1973); W. Prosser, *Law of Torts* § 63 at 399 (4th ed. 1971).

More recent cases, in an attempt to implement modern social policy, have carved a number of exceptions to the lessor's near absolute immunity from tort liability for injuries occurring on the leased premises. The general rule remains, however, that the lessor is not subject to liability to those on the land with the consent of the lessee (such as employees) for physical harm caused by a dangerous condition *which comes into existence after the lessee has taken possession of the land. Rendall v. Pioneer Hotel, supra;* Restatement (Second) of Torts § 355 (1965). It is undis-

puted that the unloading riser was constructed after the lease of the premises. Therefore, under the general rule expressed in § 355, Santa Fe would not be liable for injuries sustained by Formentini.

Section 355 refers to several exceptions to the general rule. Two of the exceptions (in §§ 360 and 361) pertain to circumstances in which the landlord leases part of the premises but retains control over other portions which the tenant and others lawfully on the premises may or must use in conjunction with the leased premises. The comments to those sections provide examples of "retained control areas" such as common entrances, stairs and hallways. Since Santa Fe leased the entire 1.18 acres for the exclusive use of Suburban Gas (later Williams), we find these exceptions inapplicable.

Another exception to § 355 applies when the landlord negligently makes repairs on the premises, thereby increasing the danger of the physical condition of the land or creating a deceptive appearance of safety. Since Santa Fe did not repair the unloading riser, this exception is also inapplicable to the circumstances presented here.

One final exception to § 355 is found in § 357, which provides:

§ 357. Where Lessor Contracts to Repair

A lessor of land is subject to liability for physical harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession if

(a) the lessor, as such, has contracted by a covenant in the lease or otherwise to keep the land in repair, and

(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented, and

(c) the lessor fails to exercise reasonable care to perform his contract.

Comment b(1) to § 357 states, "The rule stated in this Section ... has no application where the lessor does not contract to repair, but merely reserves the privilege to enter and make repairs if he sees fit to do so." The language of paragraph 7 of the lease, quoted earlier, provides that Santa Fe *may, at its option,* perform repair work on the premises. We find that this language clearly demonstrates that paragraph 7 is a mere reservation of the right to repair as under comment b, and not a covenant or contract to repair as contemplated in § 357. Santa Fe had no legally enforceable obligation to repair the premises simply because Santa Fe reserved a right to perform such repairs, and therefore owed no duty to Formentini for allegedly defective facilities on the premises.

Finally, with regard to the lease, although we note that paragraph 8 can be construed as giving Santa Fe the right to compel compliance with safety regulations, such a right does not affect the ordinary rule of lessor nonliability for demised premises. "The retention of both the right to inspect and the right to require compliance ... with applicable safety statutes and regulations did not reserve to [Santa Fe] the right to exercise day-to-day control over [Williams'] operations." *Peterick v. State,* 22 Wash.App. 163, 172, 589 P.2d 250, 257–258 (1977).

Without a right of control over the method in which Williams conducted its operations, *Peterick v. State, supra,* or an express contractual obligation to repair the premises, *Rendall v. Pioneer Hotel, supra;* Restatement (Second) § 355 (1965), we find Santa Fe owed no duty to Formentini to ensure Williams' safe operation of the unloading riser.

We next turn to the Formentinis' second contention that Santa Fe is liable for engaging in an abnormally dangerous, ultrahazardous activity. Division 2 of this Court in *Correa v. Curbey,* 124 Ariz. 480, 605 P.2d 458 (App.1979), applied the Restatement (Second) of Torts in determining whether blasting could be classified as abnormally hazardous activity. The applicable Restatement section is § 519 of the

Restatement (Second) of Torts (1977). That section provides:

§ 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) *This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.* (Emphasis added)

Santa Fe's activity here was to transport the LPG to Williams' unloading facilities. The kind of potential harm which makes such activity dangerous is the danger of explosion during transportation of the LPG. Santa Fe, however, safely performed its allegedly ultrahazardous activities and cannot be held liable for any harm resulting from activities occurring subsequent to Santa Fe's transportation.

We also do not agree with the Formentinis' contention that Santa Fe had the "means of controlling the entire unloading process" and therefore was strictly liable for any injuries resulting from that allegedly ultrahazardous activity. We determined previously that Santa Fe had no duty either as a common carrier or lessor of the premises to control or supervise the unloading process. Santa Fe's only duty was to safely transport the LPG. Formentini does not and cannot allege that his injuries resulted from Santa Fe's performance of its transportation duties. Therefore, the claim of liability under an abnormally dangerous, ultrahazardous activity theory fails.

The summary judgment in favor of Santa Fe is affirmed.

CORCORAN and KLEINSCHMIDT, JJ., concur.